1  HOLLY S. HANOVER, Esq.
   California State Bar Number 177303
2  1016 La Mesa Ave.
   Telephone:  (619) 295-1264
3  E-Mail: Netlawyr@aol.com
   Attorney for Defendant, Mr. Jordan Arnold
4

5              **UNITED STATES DISTRICT COURT**
              **SOUTHERN DISTRICT OF CALIFORNIA**
6                  **(THE HON.  LARRY A. BURNS)**

7  **UNITED STATES OF AMERICA,**        )    **CASE NO.  08cr0274-LAB**
        **Plaintiff,**                  )
8                                       )    **DATE:   April 18, 2005**
   **v.**                               )    **TIME:   10:30 a.m.**
9                                       )
   **JORDAN ARNOLD,**                   )    **STATEMENT OF FACTS AND**
10       **Defendant.**                 )    **MEMORANDUM OF POINTS AND**
                                        )    **AUTHORITIES IN SUPPORT**
11 _____      )    **OF DEFENDANT'S MOTION**

12                            I.

13                    STATEMENT OF FACTS

14      This statement of facts is based upon the 175 pages of discovery

15 provided in this case by the government.  The defense does not adopt any

16 of these facts as its own.  Much of that discovery that has been turned

17 over has several areas which are blanked out in key spots, so it is

18 impossible to tell with any accuracy what information may have been

19 provided.  Many of the statements and facts alleged in the governments

20 statement of facts within their response to the defense's discovery

21 motion are coming from sources that have not yet been revealed to the

22 defense.

23      Pages 1-56 of the discovery received are essentially summaries

24 of investigator's reports.  Pages 57-175 are apparently copies of

25 printouts from craigslist.com (without any pictures) with specific

26 listings placed by a ddsbabybubbles@(providerwitheld).com,  No other

27 information has been given to defense counsel by the prosecution in this

28 case.

                            1                          08cr0274

1    On September 25, 2007, an ad was placed on craigslist.com by
2  ddsbabybubbles@(providerwitheld).com, which offered "erotic services"
3  in the Mission Valley area of San Diego.  Men were asked to call Bubbles
4  at (619) 760-xxxx.  Similar ad was also apparently placed again that
5  day, on September 29 and 30, October 1 (now using the name, "Dizzy"),
6  October 2, 5,6,7,10,11,and 14[1], all using that telephone number as well
7  as (619) 817-xxxx and (619) 847-xxxx[2].

8    Between September 25, 2007 and October 11, 2007, officers from the
9  San Diego police department in conjunction with federal agents seem to
10 have set up a sting operation which calls the numbers from craigslist
11 postings, and tries to set up "dates" with the person's  posting in the
12 "erotic services" section.  It is not known by the defense how officers
13 came about information to conduct surveillance on the address of Sylvia
14 Arnold that same evening at 7276 Gatewood Lane.  No reports about the
15 need to set up surveillance nor reports about how this operation came
16 about have been provided to the defense.

17   On October 11, 2007, detectives Castillo, Hunter, and Sergeant
18 Morales were conducting surveillance on the residence located at 7276
19 Gatewood Lane.  Two vehicles were parked in front of the residence.  The
20 first was a 1998 Honda with a California License plate of 4SLK577, and
21 the second was a 1996 Honda with a California License plate of 3PJJ474.

22   At 8:35 p.m. Detective Dwayne Glazewski, posing as a "John" named
23 "Cody", called telephone number (619) 760-xxxx, and left two messages

24

25 [1]These ads were modified generally approximately a week after
      posting.
26
27 [2] First names, website providers names, and the last four digits of
      phone numbers are blocked out to avoid reference to specific
      minors in the public record.  The government has not
28    turned over some information about some individuals as well.

1  for "Dizzy".

2      At 9:00 p.m., detective Castillo saw a dark sedan with California

3  license 4BIR782 pull up to the residence.  A black male, whom the

4  detectives later identified as Jordon Arnold walked into the residence[3].

5  Five minutes later, he exited the residence, and got into the Honda with

6  the license 4SLK577 (R.O is Syvlia Arnold, of 7276 Gatewood Lane, San

7  Diego), and a white female with blonde hair got into the passenger side

8  of the vehicle.  The vehicle drove west on Gatewood Lane.  Detectives

9  followed the vehicle to Wings N Things at 1499 E Plaza Blvd.

10     Officers state in their summaries that Mr. Arnold met with several

11 unidentified black males and later drove away.  He next drove to

12 Churches Chicken at 504 Euclid Ave. *(If anything happened here, it was*

13 *blacked out in discovery, as were many other areas in the discovery*

14 *pages)*. Mr. Arnold then drove back to Wings N Things and the Baskin

15 Robbins Ice Cream store next door.  Both he and the blonde white woman

16 walked in and out of Baskin Robbins.  Mr. Arnold then drove to the 7-11

17 at 3100 E. Plaza Blvd.  It was at this location that detectives

18 apparently saw three occupants in the vehicle when they pulled up a

19 little closer to the vehicle.

20     At 9:45, Detective Glazewski called the number again, and made

21 contact with the female named "Dizzy", whom also seems to be referred

22 to as MINOR #2 in discovery.  Dizzy indicated she was on her way to get

23 a hotel room, and would call him back around 10:30.

24     At 10:45, officers say they saw Mr. Arnold drive to the Howard

25 Johnson's Inn at 1631 Hotel Circle South.  Detectives then left

26 surveillance at the Howard Johnson's Inn and set up on the perimeter of

27 _____

28 [3] Jordon Arnold was 19 at the time of the arrest, and turned 20
   while he was in custody.

1   the La Jolla Marriot Hotel at 4240 La Jolla Village Drive (This is

2   apparently where detective Glazowski set up an "outcall" with "Dizzy"

3   Carrol). At 11:15, Glazowski called again and left another message for

4   Dizzy to call him back. Two minutes later, she did, and she told him

5   that she was unable to get a room because they were all full.

6      Detective Glazowski told her not to worry about it because he had

7   a room at the La Jolla Marriot, and he could meet her there. Dizzy said

8   she would call him back. She did five minutes later to let him know she

9   was on her way and would call when she got closer to get directions.

10   Apparently several calls were made back and forth because Dizzy had gone

11   to the wrong hotel.

12      At approximately 12:50 a.m. or 1:00 a.m. that morning, detectives,

13   along with SA Regula, observed what they believed to be Mr. Arnold

14   driving his Honda into the La Jolla Marriot, drop off someone (the name

15   was blanked out in discovery), and then drove away. A second vehicle

16   surveillance followed Mr. Arnold to 4100 Plaza de Palmas, where they say

17   that Mr. Arnold parked, and according to officers, he "blacked out"

18   along the north curb line. At 1:10 a.m., the officers received word

19   that apparently a 647(b) PC had occurred back at the La Jolla Marriot.

20   Officers immediately arrested Mr. Arnold, as well as a sixteen year old

21   passenger, identified as Ashley. Ashley was detained for curfew

22   violations, and Mr. Arnold was arrested in connection with the 647(b)

23   case.

24      On October 12, at approximately 1:07 a.m, Dizzy (AKA: MINOR #2) was

25   questioned, but no further information about her statements were

26   provided beyond an initial few questions. If this interview was

27   recorded, it was not provided to the defense in discovery, nor have any

28   notes about these interviews been turned over.

1    At approximately 2:40 a.m., Ashley (AKA: MINOR #3) was questioned

2  at police headquarters by detective Glazewski and SA Regula.  If this

3  interview was recorded, it was not provided to the defense in discovery,

4  nor have any notes about these interviews been turned over.

5    She said she lived at home with her parents and siblings, and that

6  she had stopped going to school after she had been involved in a drive-

7  by shooting some time in August, 2007.  She apparently admitted to

8  officers that she had begun working as a prostitute about three to four

9  weeks prior to that date, because her family was financially unstable,

10  and the house had no electricity.  She said the electric bill got to be

11  approximately $1,400 before it was shut off.  Because of this, she had

12  begun to think of ways to get money to help her mother.

13    Ashley denied that her sister was involved in prostitution, and she

14  said that she did not have a pimp, and that she was working for herself.

15  She said that she had met Mr. Arnold at a party around August, 2007, and

16  they had rap music in common to talk about, so they exchanged telephone

17  numbers.  She said she met MINOR #2 through Mr. Arnold when they came

18  to her house together to pick her up to drive to a Holiday Inn near Old

19  Town.  Also in the group at that time was another black male known as

20  "profit", but no further mention was made of him in any other reports.

21    Ashley said she met MINOR #2 and MINOR #1 (name blacked out in

22  discovery)[4], the day after they had run away from the group home, and

23  that is why Mr. Arnold took them to a hotel to stay to hang out.  The

24  next day, MINOR #1 and MINOR #2 moved in with Ashley at her family

25  residence.

26    Ashley stated that Mr. Arnold was not her pimp.  She said she

27

28  [4]At several key points during each interview of Ashley, Leleana, and
Minor #2, discovery is blacked out.

                       **08cr0274**

1 simply asked him to help her with her financial spending because she was
2 not very responsible, and she wanted to help her mother out. She asked
3 him to hold on to her money and pay for the things she wanted. She
4 claimed she did all her own posting onto Craigslist herself by using the
5 computers at Kinkos or a laptop that was at Mr. Arnold's home, as well
6 as a laptop that was located at the Holiday Inn.

7 Ashley said that Jessica LNU took all of the photos used by Ashley
8 on Craigslist. She said she updated these pictures with a few that Mr.
9 Arnold took of her a few days prior to her arrest while at the Premiere
10 Hotel in Mission valley. She used these photos because she was pleased
11 with the way they looked. She also said she had Mr. Arnold drive her
12 around to various locations.

13 Ashley claimed that on October 10, she said she was staying at the
14 Premiere Hotel in room #205 when she got a call from a "John" and said
15 she went with MINOR #2 to the "John's" house to party the whole night.

16 At 4:40 a.m., Mr. Arnold was finally interviewed by officers Dwayne
17 Glasewski and SA Josefina Regula, and at 4:43, he was read his Miranda
18 rights. At that time, he said "I'm gonna listen to my Mom and I'm gonna
19 get an attorney". Agents say they stopped questioning him at that time,
20 but it is believed the way they stopped questioning him was by telling
21 him that, "Moms can either hurt your or help you. It is up to you,
22 man". If this interview was recorded, it was not provided to the
23 defense in discovery, nor have any notes about these interviews been
24 turned over.

25 Mr. Arnold then asked what type of questions they would have asked
26 him because he knew he did nothing wrong. Agents then apparently
27 misconstrued this as permission to continue interrogating him, and began
28 to ask him questions again, and Mr. Arnold responded by giving officers

1  answers to all types of questions.

2      On October 12, Sergeant Rickman, detectives J. Clark, J. Hunter and

3  officer L. Tibbets of the San Diego Police Department contacted Victoria

4  Padilla in her home.  Ms. Padilla is the mother of Ashley (AKA MINOR #3)

5  and Leleana.  Ms. Padilla was living in a home with no electricity,

6  because she owes more than $900 on her bill.  She receives social

7  security benefits of approximately $800 per month and food stamps and

8  section 8 benefits to pay her rent (all but $100 of it).  She confirmed

9  to officers that she had been having a hard time making ends meet.

10      At the time she was interviewed, Ms. Padilla indicated she knew her

11  daughters were prostitutes, that the girls were very up-front about it,

12  and she did not consider Mr. Arnold their pimp (she referred to him as

13  "Demi").  Ms. Padilla told officers that her daughter was the one that

14  instructed the girls about the prostitution activities.  She indicated

15  that Demi had helped out with a few smaller bills and had gotten her a

16  jacket.

17      Ms. Padilla went on to talk about how she and the girls and "Demi",

18  and a girl named "Heather" had stayed at the Premiere Inn in Mission

19  valley the Past Wednesday to watch TV and "kick back", and Demi was

20  joined by a few of his friends there as well.  She said she felt

21  comfortable with this situation because she had a key to the room her

22  daughter's slept in next door.  Ms. Padilla stated that she went out

23  with Demi and Ashley to buy Smirnoff coolers at some point during that

24  night.

25      Later during the conversation, Ms. Padilla indicated that the girls

26  had not been living at home lately because Ashley had witnessed a

27  shooting about a month prior to that point in front of their house, and

28  she was afraid to stay home because of retaliation from the victim's

1  family.  They had been living with "Demi" since they are rehearsing for

2  a CD during the late night hours.  Apparently, detectives recorded part

3  of this interview on CD after they thought that Ms. Padilla had "useful"

4  information, but to date, no such recording has been provided to the

5  defense.

6       Agents subsequently went to the Premiere Inn in Mission Valley and

7  obtained receipts for Mr. Arnold staying there on the nights of October

8  10, October 2, and October 6, 2007.

9       On October 16, detective D. Glazewski decided to take Ashley and

10 Leleana from their parent's custody and place them in the Polinsky

11 center, because their mother allegedly knew about their involvement in

12 prostitution and received benefits from her daughters' profits.  At 5:00

13 p.m. that day, agent Regula spoke to detective Glazewski about the case

14 and meeting with Ashley at the trolley station located at 5000 Market

15 Street, which is across the street from the Writer's Block.

16      Agent Regula picked up Ashley in her vehicle, and at that time,

17 Ashley told agent Regula that she was the pimp and not Mr. Arnold.  When

18 asked about Sylvia Arnold visiting her house, Ashley said that Sylvia

19 had spoke with her mother, Victoria, and said that Mr. Arnold had only

20 indicated that Mr. Arnold was ok. When specifically asked if Sylvia

21 Arnold told her what to say, Ashley said she was not told what to say

22 to any agents.

23      Immediately after this discussion, both Ashley and Leleana were

24 taken into custody and transported to the Vice Operations office to be

25 interviewed.  Then, they were transported to the Polinsky Center.

26      When interviewed at the Police department at approximately 7:40

27 p.m., Leleana was asked about how she knew how to do the postings on

28 Craigslist, and her answer was non-responsive.  An entire paragraph

1  after this question is blanked out in the discovery documents. She said

2  she learned to pose (it is believed this is a type and is meant to be

3  "post") from Jessica and saw Jessica "post" on Craigslist at the hotels

4  while "Demi" just watched television. She said that at no time did

5  "Demi" talk to her about prostitution. More discovery is blacked out

6  during this conversation, but she claimed she did her own posting as was

7  responsible for getting a picture of her taken herself, and learned most

8  of what she knew about prostitution and soliciting clients from Jessica.

9       Leleana said that she was only prostituting for herself because she

10  wanted to help out her mother financially and to have some money for

11  herself. She said she did not have a pimp, and did not give anyone else

12  any money except for her mother. Agents refused to believe her and

13  accused her of lying, but she remained adamant about prostituting on her

14  own.

15       It was at this point when detective Glazewski told Leliana that

16  because her mother knew that she and her sister were prostituting and

17  was accepting money from them, that she could possibly be arrested for

18  the facilitation to prostitution and child endangerment. He said her

19  mother could be arrested for her actions, and this made Leleana start

20  to cry. In the officer's own words, Leleana, "became really worried

21  that her mother was going to be arrested". Detective Glazewski then

22  tried to calm her down by saying that it was his intention to assist

23  Leliana, her sister and her mother to get them out of their situation,

24  but, "the only way I could do this is if I gained cooperation from she,

25  her mother and Ashley". Otherwise, he assured her, the situation could

26  only get worse. Leleana gave several detailed statements to the

27  detective after this conversation.

28       The government in it's agent's reports, alleges that Mr. Arnold

1  called his mother several times while in state custody (between August
2  12 and October 15, 2007), and alleges details about conversations that
3  took place.  If those conversations were recorded, no such recordings
4  of Mr. Arnold have been turned over to the defense, despite making both
5  a general request for them in the defense's discovery motion and a
6  specific request for them verbally before the detention hearing took
7  place on.

8      On November 13, 2007, detective Glazewski took Mr. Arnold's cell
9  phone (no. (619) 847-4001)) from impound and looked inside the phone,
10  and allegedly found photographs (among other photos) which according to
11  the detective, appeared to be the same photograph's of Ashley and
12  Leleana which were found on Craigslist.  No documentation of any
13  verification procedures to see if they were the same or similar photos,
14  nor how or what photos were actually posted to the internet has been
15  given or even shown to the defense.

16      On December 14, 2007, after nearly two months being held in the
17  Polinksy Center, Ashley was interviewed again by detective Glazewski,
18  and SA Navarro.  Agents claim that Ashley asked for the meeting because
19  she wanted to get things off her chest.  It is unknown what "therapy"
20  was provided to her or what other influences were working on her during
21  her incarceration at the Polinsky Center to influence this change in
22  testimony, but at this point, she changed her story quite a bit.  She
23  also admitted to posting her listings online with the email address
24  babybubbles@yahoo.com. She also said again that Jessica took photos of
25  her using Mr. Arnold's phone for the listings.

26      Leleana was also interviewed again around that time at the same
27  location, and virtually the entire interview was blanked out of
28  discovery.

1

## II.

2

### THE INDICTMENT SHOULD BE DISMISSED

3

**A.   VINDICTIVE PROSECUTION AND GOVERNMENTAL MISCONDUCT**

4

   1. BACKGROUND

5   On February 12, 2008, after being held in state custody, and going
6   through four months of state court proceedings to have the charges
7   dropped (presumably so the Federal Authorities could take over
8   prosecution), Mr. Arnold's detention hearing on federal charges for this
9   case were held for Mr. Arnold.  Before the hearing began, defense
10  counsel approached the prosecution to ask a few questions, because the
11  175 page discovery packet was picked up just prior to the hearing.

12  Given the fact that it was a rather unusual case for the federal
13  courts to deal with in the Southern District of California, defense
14  counsel remarked that this looked like a state case, and asked what the
15  federal connection was.  The Assistant United States Attorney (Mr.
16  Tenorio) responded that some ads had been placed on Craigslist.

17  After obtaining the government's position for how the case could
18  possibly have a federal nexus, defense counsel asked the next logical
19  question - Why was it being charged in the federal system?  Mr.
20  Tenorio's response was that the federal authorities were charging Mr.
21  Arnold, because the federal case carried a minimum mandatory prison term
22  (unlike the California state penalties for the same crimes charged).

23     2.  ARGUMENT

24  Federal prosecutors have historically been given a wide latitude
25  in many of the decisions they make.  Because of this, the prosecutor has
26  always been regarded as one of the most powerful officials in
27  government.  In recent years, the power of the prosecutor has increased
28  through legislative enactments of harsher minimum mandatory penalties,

1  bold prosecutorial initiatives, and judicial acquiescence[5].

2      The presumption that prosecutors act in good faith has made Courts

3  reluctant to interfere with charging practices.  However, Courts have

4  been known to impose limits on excessive charging practices.  ***See***.

5  United States v. Coates. 949 F.2d 104 (4th Cir. 1991) (government

6  manufactured federal interstate nexus through telephone call, thereby

7  transforming state murder prosecution into federal offense); see also

8  United States v. Ivic. 700 F.2d 51, 59-61 (2d Cir. 1983) (RICO

9  prosecution dismissed where "enterprise" not shown to have financial

10 purpose); United States v. Archer, 486.F.2d 670 (2d Cir. 1973) (federal

11 prosecution under Travel Act failed to show that interstate facilities

12 were used to promote corruption).

13     When a prosecutor manufactures a federal nexus to make a federal

14 case out of events, this is considered improper.  United States v.

15 Coates. 949 F.2d 104 (4th Cir. 1991).  That is exactly what has happened

16 in this case.  The females that were acting as prostitutes posted their

17 own listings on craigslist.com in the local San Diego section, posting

18 a local (619) San Diego number, clearly looking for local clients.

19 There was no intention by anyone involved in the case, to travel over

20 state lines, or conduct any business outside of San Diego[6].

21     The government, by asserting that the postings on Craigslist.com

22 which connect to completely local criminal activity, creates a federal

23

24     [5] Points made in "The New Prosecutors", by Bennett L. Gershman, 53
25 U. Pitt. L. Rev. 458 1991-1992

26     [6] The defense would dispute any assertion by the government that Mr.
27 Arnold himself placed any ads on the internet.  It is likely that it
   would even dispute that the pictures were taken by Mr. Arnold as it is
   believed Jessica was the individual whom took the pictures using Mr.
28 Arnold's phone.

1  crime simply because craigslist is on the internet, is manufacturing a

2  federal crime to selectively prosecute this case and punish it in the

3  federal system, simply because the punishments are more harsh in the

4  federal system.

5      Federal jurisdiction in criminal prosecutions should not be

6  recognized when the means for creating the crime a federal one, are

7  patently contrived.    Federal courts are under an obligation to

8  "scrutinize the government's apparent reasons for its actions" whenever

9  such a jurisdictional ploy was suggested. United States v. Garrett, 716

10 F.2d 257, 263 (5th Cir.1983).

11      As such, all counts in the indictment are not based upon cognizable

12 federal jurisdiction and should be dismissed.  For these reasons, Mr.

13 Arnold moves for an order of dismissal.

14 **B.    The Government has not fulfilled it's discovery obligations.**

15      1. BACKGROUND

16      When counsel was last before the Court on March 17, 2008, it

17 explained it's dismay at a serious discrepancy between the discovery

18 that had been turned over by the government in this case (175 pages thus

19 far, and nothing further has been provided to date) and the discovey it

20 was told the state public defender's office had in it's possession.  The

21 reason counsel was aware there was a problem, was because the defense

22 contacted the state public defender's office, and was told that the

23 discovery in their possession for the state case stacked almost a foot

24 high.  At the March 17 hearing, the Assistant United States attorney

25 claimed that they might have some additional materials, but suspected

26 much of that could not be turned over given new legal constraints about

27 certain photographs.

28      Since that time, defense counsel has obtained some of the discovery

1  that was in the public defender's possession, and it is quite disturbing

2  how much more information exists on this case than has been turned over

3  or revealed by the United States - despite several attempts to ask for

4  additional materials, nothing additional has been turned over beyond the

5  initial 175 pages of discovery.  That packet contained 56 pages of

6  summaries of investigator's reports, and the remainder of the pages were

7  apparently copies of printouts from craigslist.com with specific

8  listings placed by a ddsbabybubbles@yahoo.com.  No other information has

9  been given to defense counsel by the prosecution in this case.

10      2.   ARGUMENT

11      Federal Rule of Criminal Procedure 16(d)(2) gives the trial court

12  substantial discretion to impose sanctions for failure to comply with

13  discovery orders.  It states that, "the court may order [the violating

14  party] to permit discovery or inspection, grant a continuance, or

15  prohibit the party from introducing evidence not disclosed, or it may

16  enter such other order as it deems just under the circumstances." Fed.

17  R. Crim. P. 16(d)(2).

18      A continuance is clearly the least intrusive remedy to a discovery

19  violation, allowing for review of undiscovered information and further

20  investigation. *See U.S. v. Olson*, 697 F.2d 273 (8th Cir. 1983). The

21  judge may also exclude the evidence or strike it from the record and

22  instruct the jury to disregard it. *U.S. v. Cruz-Velasco*, 224 F.3d 654,

23  665 (7th Cir. 2000).  In this case, this Court has continued the case

24  once already, in the hopes that discovery issues would be resolved, but

25  nothing has been done by the government in this case to turn anything

26  else over to the defense.

27      The defense has come up with a specific list of missing or blacked

28  out items that it believes exists, but which have still not been turned

1  over to the defense by the government in this case (this list is not

2  exhaustive by any means - it is only meant to provide some specific

3  examples to the Court):

4  1.  Several sections in the reports from pages 1-43 are blacked out
       (and entire sections removed) in key areas.  Defense counsel would
5      like to have the un-redacted reports turned over - or at the very
       least - the un-redacted reports turned over to the Court to make
6      a determination as to whether or not it should be turned over as
       discoverable.

7  2.  Reports, subpoenas, or search warrants which show how and why
       agents believed it was necessary to put the house of Sylvia
8      Arnold, located at 7276 Gatewood Lane under surveillance.

   3.  On page 1 of the discovery, the government alleges phone calls
9      were made between Mr. Arnold and his mother, and gives details of
       the alleged conversations.  Defense counsel has not received any
10     copies of those conversations

   4.  While it seems that MINOR #3 is Ashley, it is not clear as to
11     specifically MINOR #1 and MINOR #2 are.  Some documentation to
       clear this up would be helpful.

12 5.  The interview of Ashley on October 16, 2007 was documented in a
       summary report, but no recordings or notes about this interview
13     were provided.

   6.  The interview of Leleana on October 16, 2007 was documented in a
14     summary report, but no recordings or notes about this interview
       were provided.

15 7.  No cell phone records have been turned over at all.

   8.  No documentation has been provided to date about what photos were
16     on the phone that was alleged to be Mr. Arnold's, nor how those
       photos may be similar or even related to the photos that were on
17     craigslist.com

   9.  No documentation about any text messages have been turned over.
18 10. There is mention of an individual named Carroll at some point in
       the reports, but no additional information has been provided about
19     this individual, though it seems related to this case in some
       fashion.

20 11. Victoria Padilla was interviewed by detective J. Clark, J. Hunter
       and L. Tibbetts.  Officer Tibbetts stated in his summary that
21     after it was determined Ms. Padilla had "important" information,
       he elected to record the remainder of the interview.  He refers to
22     a CD for details of the interview.  This has not been turned over,
       nor have any notes from any of the officers involved in this
23     interview.

   12. It is unclear as to whom the blonde female arrested on October 12
24     was, other than "Dizzy" or MINOR #2.  Defense has no way to locate
       her or interview her without further identification.

25 13. On October 12, 2007, Dizzy (MINOR #2) was interviewed by Det.
       Dwayne Glazewski and SA Josefina Regula.  No recording of this
26     interview has been turned over, nor have any notes by the officers
       involved - and no other report has been revealed about the
27     interview either.  There was simply a cursory mention of it in
       another report.

28 14. On October 12, 2007, Ashley (MINOR #3) was interviewed by Det.

Dwayne Glazewski and SA Josefina Regula.  No recording of this interview has been turned over, nor have any notes by the officers involved - beyond a summary report

15.  On October 12, 2007, Jordan Arnold was interviewed by Det. Dwayne Glazewski and SA Josefina Regula.  No recording of this interview has been turned over, nor have any notes by the officers involved - beyond a summary report.

16.  The surveillance which occurred on October 11-12, 2007 was done by coordinating several officers, but no recordings of dispatch tapes have been turned over, nor have any surveillance videos been turned over.

17.  A kinko's card was obtained by officers, but the date from it or even a copy of it has not been turned over, nor has any information related to subpoenas on records related to it.

18.  Victoria Padilla turned over a digitial cameral to Det. Tibbetts so agents could download photos from it on October 12, 2007.  No photos from that camera have been turned over.  If turning over such photos would be a violation of law, then counsel simply requests access to view them.

19.  On December 14, 2007, Ashley was interviewed again by agents.  No recording of this interview, nor have any agent notes been turned over to counsel beyond the summary ROI.

20.  On December 14, 2007, Leleana was interviewed again by agents.  No recording of this interview, nor have any agent notes been turned over to counsel beyond the summary ROI.

21.  It seems that at least one computer was seized from Mr. Arnold's home, but no information about the items on that computer have been revealed or turned over.

22.  Upon a cursory viewing of the discovery in the Public Defender's possession, it appears numerous CD's exist with information on this case, yet nothing of this nature has been turned over by the government in this case.

23.  No rap sheet has been turned over for anyone involved in this case, including Mr. Arnold or any other witnesses.  If the females involved in this case have done this prior to Mr. Arnold's alleged involvement, that would be obvious Brady material, but almost no mention is made of this in any summaries.

24.  Who are Christopher W. John Anthony S. and Virgina M.?  The Public Defender's materials seem to have quite a bit of information about them ***AND SEVERAL OTHER INDIVIDUALS*** as possible witnesses or even suspects, yet the government in this case has not made any mention of them in any of the documentation that was turned over.

25.  Who are Price Tag, Profit, C-Money and Black?  The government made mention of them in an e-mail, yet no real information has yet been provided about them.

The most drastic remedy for the prosecution's failure to comply with discovery is dismissal of the indictment under Rule 16(d)(2), and while that may not yet be warranted, counsel wishes to express very deep concern over the lack of discovery turned over in this case, and re-

1  iterates that it cannot provide adequate assistance to Mr. Arnold, as

2  is his sixth amendment right, unless the government complies with it's

3  discovery obligations far enough in advance of trial to allow adequate

4  time to review all materials and prepare for trial.

5                                  **III.**

6           **ANY STATEMENTS MADE BY MR. ARNOLD SHOULD BE SUPPRESSED**

7  **A.     The Government Must Demonstrate Compliance With *Miranda*.**

8           In their report, Officer Glasewski and SA Regula claim that

9  Mr. Arnold was read his <u>Miranda</u> rights and that Mr. Arnold and

10  despite the fact that he invoked his right to counsel, they

11  apparently believed that this right was waived by asking them a

12  question.  Subsequently, Mr. Arnold allegedly made incriminating

13  statements.

14      **1.     *Miranda* Warnings Must Precede Custodial Interrogation.**

15          The Supreme Court has held that the prosecution may not use

16  statements, whether exculpatory or inculpatory, stemming from a

17  custodial interrogation of the defendant unless it demonstrates the

18  use of procedural safeguards effective to secure the privilege

19  against self-incrimination.  <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436,

20  444 (1966).  The law imposes no substantive duty upon the defendant

21  to make any showing other than that the statement was taken from the

22  defendant during custodial interrogation.  <u>Id.</u> at 476.   Custodial

23  interrogation is questioning initiated by law enforcement officers

24  after a person has been taken into custody or otherwise deprived of

25  his freedom of action in any significant way.  <u>Id.</u> at 477;  <u>see</u>

26  <u>Orozco v. Texas</u>, 394 U.S. 324, 327 (1969).

27          In <u>Stansbury v. California</u>, the Supreme Court clarified its

28  prior decisions by stating that "the initial determination of custody

                                    17                        **08cr0274**

1  depends on the objective circumstances of the interrogation, not on

2  the subjective views harbored by either the interrogating officers or

3  the person being questioned." 511 U.S. 318, 323 (1994). The Ninth

4  Circuit has held that a suspect will be found to be in custody if the

5  actions of the interrogating officers and the surrounding

6  circumstances, fairly construed, would reasonably have led him to

7  believe he could not freely leave. See United States v. Lee, 699

8  F.2d 466, 468 (9th Cir. 1982); United States v. Bekowies, 432 F.2d 8,

9  12 (9th Cir. 1970).

10      In determining whether a person is in custody, a reviewing court

11 must consider the language used to summon the defendant, the physical

12 surroundings of the interrogation, and the extent to which the

13 defendant is confronted with evidence of his guilt. See United

14 States v. Estrada-Lucas, 651 F.2d 1261 (9th Cir. 1980).

15      Once a person is in custody, Miranda warnings must be given

16 prior to any interrogation. In United States v. Leasure, the Ninth

17 Circuit held that "custody," for the purposes of Miranda warnings,

18 usually begin at the point of secondary inspection in border cases.

19 122 F.3d 837, 840 (1997). Miranda warnings must advise the

20 defendant of each of his or her "critical" rights. See United States

21 v. Bland, 908 F.2d 471, 473 (9th Cir. 1990). Furthermore, if a

22 defendant indicates that he wishes to remain silent or requests

23 counsel, the interrogation must cease. See Miranda, 384 U.S. at 473-

24 74; see also Edwards v. Arizona, 451 U.S. 477, 482 (1981).

25      **2.  The Government Must Demonstrate That Mr. Arnold's Alleged
        Waiver Was Voluntary, Knowing, and Intelligent.**

26

27      For a defendant's inculpatory statements to be admitted into

28 evidence, the defendant's "waiver of Miranda rights [during custodial

1  interrogation] must be voluntary, knowing and intelligent." <u>United</u>

2  <u>States v. Binder</u>, 769 F.2d 595, 599 (9th Cir. 1985) (citing <u>Miranda</u>

3  384 U.S. at 479); <u>see also</u> <u>United States v. Vallejo</u>, 237 F.3d 1008,

4  1014 (9th Cir. 2001); <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973).

5

6        When interrogation continues in the absence of an attorney, and

7  a statement is taken, a heavy burden rests on the government to

8  demonstrate that the defendant intelligently and voluntarily waived

9  his privilege against self-incrimination and his right to retained or

10  appointed counsel. <u>See</u> <u>Miranda</u>, 384 U.S. at 475.  The Ninth Circuit

11  has held, "[t]here is a presumption against waiver." <u>Garibay</u>, 143

12  F.3d 534, 536-37 (1998) (citing <u>United States v. Bernard S.</u>, 795 F.2d

13  749, 752 (9th Cir. 1986)) (other internal citations omitted); <u>see</u>

14  <u>also</u> <u>United States v. Heldt</u>, 745 F.2d 1275, 1277 (9th Cir. 1984)

15  (stating that the court must indulge every reasonable presumption

16  against waiver of fundamental constitutional rights) (citing <u>Johnson</u>

17  <u>v. Zerbst</u>, 304 U.S. 458, 464 (1938)).

18        The validity of the waiver depends upon the particular facts and

19  circumstances surrounding the case, including the background,

20  experience, and conduct of the accused. <u>See</u> <u>Edwards</u>, 451 U.S. at

21  482; <u>Zerbst</u>, 304 U.S. at 464; <u>see also</u> <u>Garibay</u>, 143 F.3d at 536; <u>see</u>

22  <u>also</u> <u>Bernard S.</u>, 795 F.2d at 751 (stating that "[a] valid waiver of

23  Miranda rights depends upon the totality of the circumstances,

24  including the background, experience and conduct of the accused").  A

25  determination of the voluntary nature of a waiver "is equivalent to

26  the voluntariness inquiry [under] the [Fifth] Amendment." <u>Derrick v.</u>

27  <u>Peterson</u>, 924 F.2d 813, 820 (9th Cir. 1990).

28        A determination of whether a waiver is knowing and intelligent,

1   on the other hand, requires a reviewing court to discern whether "the
2   waiver [was] made with a full awareness both of the nature of the
3   right being abandoned and the consequences of the decision to abandon
4   it." Id.; see also United States v. Amano, 229 F.3d 801, 805 (9th
5   Cir. 2000); Garibay, 143 F.3d at 536.  This inquiry requires that a
6   court determine whether "the requisite level of comprehension"
7   existed before the purported waiver may be upheld.  Derrick, 924 F.2d
8   at 820.  Thus, "[o]nly if the `totality of the circumstances
9   surrounding the interrogation' reveal both an uncoerced choice and
10  the requisite level of comprehension may a court properly conclude
11  that the Miranda rights have been waived."  Id. (quoting Burbine, 475
12  U.S. at 421) (emphasis in original) (other internal citations
13  omitted).

14      In this case, Mr. Arnold Invoked his right to counsel, and no
15  further warnings were given to him after he asked agents a question.
16  They simply resumed their questioning as if he had waived his right
17  to counsel, which he had not.  Unless and until Miranda warnings and
18  a knowing and intelligent waiver are demonstrated by the prosecution,
19  no evidence obtained as result of the interrogation can be used
20  against the defendant.  See Miranda, 384 U.S. at 479.

21  **B.   Mr. Arnold's Statements Were Involuntary**.

22      Even when the procedural safeguards of Miranda have been
23  satisfied, a defendant in a criminal case is deprived of due process
24  of law if his conviction is founded upon an involuntary confession.
25  See Arizona v. Fulminante, 499 U.S. 279 (1991); Jackson v. Denno, 378
26  U.S. 368, 387 (1964).  The government bears the burden of proving
27  that a confession is voluntary by a preponderance of the evidence.
28  See Lego v. Twomey, 404 U.S. 477, 483-84 (1972).

1    A voluntary statement must be the product of a rational

2  intellect and free will.  See Blackburn v. Alabama, 361 U.S. 199, 208

3  (1960).  In determining the voluntariness of a confession, the Ninth

4  Circuit has required consideration of "whether, under the totality of

5  the circumstances, the challenged confession was obtained in a manner

6  compatible with the requirements of the Constitution." United States

7  v. Bautista-Avila, 6 F.3d 1360, 1364 (9th Cir. 1993) (citations

8  omitted); see also Bustamonte, 412 U.S. at 226.  Factors a reviewing

9  court should consider when determining voluntariness include the

10 youth of the accused, lack of education, low intelligence, the

11 absence of any advice regarding the accused's  constitutional rights,

12 the length of the detention, the repeated and prolonged nature of the

13 questioning, and the use of physical punishment, such as the

14 deprivation of food or sleep, to determine if law enforcement

15 officers elicited a voluntary confession.  See Bustamonte, 412 U.S.

16 at 226.

17    In this case, at the time of his arrest, Mr. Arnold was 19 years

18 old, and had not obtained any significant amount of education.  He

19 was interviewed at 4:40 a.m. (Several hours after his arrest and in

20 the wee hours of the morning) and likely in a very tired and punchy

21 state at that point, after remaining under arrest for approximately 3

22 ½ hours prior to that point.

23    In general, a statement is considered involuntary if it is

24 "extracted by any sort of threats or violence, [or] obtained by any

25 direct or implied promises, however slight, [or] by the exertion of

26 any improper influence." Hutto v. Ross, 429 U.S. 28, 30 (1976) (per

27 curiam) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897));

28 see also United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir. 1981)

1  (agent's express statement that defendant would not see her child

2  "for a while" and warning that she had "a lot at stake", referring

3  specifically to her child, were patently coercive and defendant's

4  resultant confession held involuntary).

5  //

6  **C.    Mr. Arnold clearly asserted his Right to Counsel**

7       If the individual indicates in any manner, at any time prior to

8  or during questioning, that he wishes to remain silent or have

9  counsel present, the interrogation must cease.  At this point he has

10 shown that he intends to exercise his Fifth Amendment privilege; any

11 statement taken after the person invokes his privilege cannot be

12 other than the product of compulsion, subtle or otherwise.  Miranda

13 v. Arizona, 384 U.S. 436, 473-74, 86 S. Ct. 1602, 16 L. Ed. 2d 694

14 (1966);  [*5]  see also Michigan v. Mosley, 423 U.S. 96, 103, 96 S.

15 Ct. 321, 46 L. Ed. 2d 313 (1975) (explaining that once a defendant

16 has invoked his right to remain silent, that right must be

17 "scrupulously honored") (quoting Miranda, 384 U.S. at 479) See also,

18 Anderson v. Terhune, 516 F.3d 781 (9th Cir. 2008).

19      In this case, it is not believed that there are many facts in

20 dispute between the parties about the circumstances surrounding the

21 statements given.  Even going by the government's own reports, Mr.

22 Arnold invoked his rights by stating "I'm gonna listen to my Mom and

23 I'm gonna get an attorney."  There was nothing equivocal or unclear

24 about it.  Instead of honoring Mr. Arnold's request for counsel,

25 officers told him, "Moms can either hurt your or help you.  It is up

26 to you, man," in an attempt to try to persuade Mr. Arnold to

27 reconsider his invocation of his rights.  There could be no other

28 purpose for making such a statement to him.

1    It was after this that Mr. Arnold asked a question of the agents

2    about the types of questions they would have asked him, an agents

3    began to resume questioning of him without issuing him any further

4    Miranda warnings.  This was a violation of his Miranda rights.

5    Miranda "does not put the onus on a suspect to be persistent in

6    [his/]her demand to remain silent.  Rather, the responsibility falls

7    to the law enforcement officers to scrupulously respect [his/]her

8    demand."  United States v. Lafferty, 503 F.3d 293, 304 (3d Cir.

9    2007).

10    The Supreme Court has also stated that, "[U]nder the clear

11    logical force of settled precedent, an accused's post-request

12    responses to further interrogation may not be used to cast

13    retrospective doubt on the clarity of the initial request itself."

14    Smith v. Illinois, 469 U.S. 91, 95, 105 S. Ct. 490, 83 L. Ed. 2d 488

15    (1984) .  In this case, the agent's response to Mr. Arnold's

16    invocation of his right to counsel was designed to try and get him to

17    speak with them further, and once he did take the bait and ask them a

18    question (and a hypothetical type question at that), officers gave

19    him no further Miranda warnings.  That is a violation of the rule

20    laid out by Miranda and cases which have followed, and as such, his

21    statements should be suppressed.

22    **D.    This Court Should Conduct An Evidentiary Hearing**.

23    This Court must conduct an evidentiary hearing to determine

24    whether Mr. Arnold's statements should be admitted into evidence.

25    Under 18 U.S.C. § 3501(a), this Court is required to determine,

26    outside the presence of the jury, whether any statements made by Mr.

27    Arnold are voluntary.  In addition, 18 U.S.C. § 3501(b) requires this

28    Court to consider various enumerated factors, including Mr. Arnold's

1  understanding of his rights and of the charges against him.  Without

2  the presentation of evidence, this Court cannot adequately consider

3  these statutorily mandated factors.

4      Moreover, § 3501(a) requires this Court to make a factual

5  determination.  If a factual determination is required, courts must

6  make factual findings by Fed. R. Crim. P. 12.  <u>See</u> <u>United States v.</u>

7  <u>Prieto-Villa</u>, 910 F.2d 601, 606-10 (9th Cir. 1990).  Since

8  "`suppression hearings are often as important as the trial itself,'"

9  <u>id.</u> at 609-10 (quoting <u>Waller v. Georgia</u>, 467 U.S. 39, 46 (1984)),

10 these findings should be supported by evidence, not merely an

11 unsubstantiated recitation of purported evidence in a prosecutor's

12 responsive pleading.

13     Counsel will have Mr. Arnold sign a declaration this week about

14 what he believes agents told him at the time, and will file it with

15 the Court as soon as possible.

16                                   **IV.**

17                              <u>**CONCLUSION**</u>

18     For the foregoing reasons, Mr. Arnold respectfully requests that

19 the Court grant his motions.

20                               **Respectfully submitted,**

21
   **Dated:  April 7, 2008**              *s/ Holly Hanover*
22                                        Holly S. Hanover
                                          Attorney for Mr. Jordan Arnold
23                                        E-mail: Netlawyr@aol.com

24

25

26

27

28