```
 1  KAREN P. HEWITT
    United States Attorney
 2  CHRISTOPHER P. TENORIO
    Assistant U.S. Attorney
 3  California State Bar No. 166022
    880 Front Street, Suite 6293
 4  San Diego, California  92101-8893
    Telephone: (619) 557-7843
 5  Christopher.Tenorio@usdoj.gov

 6  Attorneys for Plaintiff
    United States of America
 7
```

| | |
|---|---|
| UNITED STATES OF AMERICA, | **GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS TO:** |
| Plaintiff, | |
| v. | **1)  SEVER MR. ARNOLD'S CASE FROM THE REMAINING DEFENDANTS; AND FOR** |
| JORDAN ARNOLD (1), | **2)  LEAVE TO FILE FURTHER MOTIONS** |
| Defendant. | |
| | CASE NO. 08CR0274(1)-LAB |
| | JUDGE: HON. LARRY A. BURNS |
| | COURT: COURTROOM 9 |
| | DATE: August 25, 2008 |
| | TIME: 2:00 p.m. |
| | TOGETHER WITH STATEMENT OF FACTS, MEMORANDUM OF POINTS AND AUTHORITIES |

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through its counsel, Karen P. Hewitt, United States Attorney, and Christopher P. Tenorio, Assistant United States Attorney, and hereby files its response in opposition to Defendant's above-listed motions. Said response is based upon the files and records of the case, together with the attached Statement of Facts and Memorandum of Points and Authorities.

//

**I.**

**STATEMENT OF FACTS**

**A.  Jordan Arnold**

    **1.  A.A.** (Date of Birth: October 9, 1991)

A.A. was born in October, 1991. In August, 2007, A.A. met Defendant Jordan Arnold at a party. A.A. truthfully told Arnold that she was 15 years old on the first evening they met. After approximately one week, Arnold began recruiting A.A. to work for him as a prostitute. A.A. relented after two days.

That same day, Arnold drove A.A. to El Cajon Boulevard and introduced her to Defendant Jessica King, who worked for Arnold as a prostitute. Arnold instructed King to teach A.A. how to solicit johns and otherwise operate as a prostitute. King instructed A.A., but left working for Arnold in approximately September, 2007.

After working once on El Cajon Boulevard, Arnold explained that he would post A.A.'s picture on Craigslist.com to solicit johns. Arnold brought A.A. to a hotel to take pictures for the internet posting. King used Arnold's mobile telephone to take pictures of A.A. in lingerie and provocative poses. A.A.'s photograph and ad were posted on the internet. A.A. received telephone calls for "dates" shortly after the ads were posted.

At Arnold's instruction, A.A. made arrangements by telephone to meet johns at various motels in the Mission Valley or Sports Arena area. Arnold and/or King usually drove A.A. to the hotels, A.A. performed a sexual act in exchange for money, A.A. called Arnold to pick her up, and A.A. gave all of the proceeds to Arnold.

//

//

**2.   L.A.** (Date of Birth: September 1, 1993)

L.A., the sister of A.A., was born in September, 1993. L.A. met Arnold at the same party in August, 2007. L.A. learned that A.A. agreed to work as a prostitute for Arnold. L.A. agreed to work as a prostitute for Defendant Christopher Black, an associate of Arnold. Pictures of L.A. were also posted on Craigslist. Arnold occasionally drove L.A. to "dates" also. L.A.'s pictures were also found on Arnold's phone. L.A. reported that she stopped working after Arnold's arrest on October 11, 2007.

**3.   H.C.** (Date of Birth: June 30, 1991)

On October 11, 2007, SDPD Vice officers responded to a Craigslist ad and made an undercover "date" with H.C. at the La Jolla Marriott. Surveillance confirmed that Arnold drove H.C. to the date. H.C. was detained for soliciting prostitution, and initially refused to cooperate against Arnold. Arnold was arrested and questioned by SDPD and FBI. A.A. was with Arnold at the time of his arrest and was also detained.

H.C. reported that she and K.W. (another juvenile from her group home) met Arnold and others on September 15, 2007, and accompanied them to several hotels in Mission Valley for three to four days. H.C. reported, and K.W. confirms, that H.C. told Arnold on the first day in the hotel that she was 16 years-old.

H.C. met A.A. during the first few days and learned she worked for Arnold in prostitution. Arnold told H.C. and K.W. they would have to choose a pimp. Arnold took pictures of H.C. at a hotel when she was in lingerie and provocative poses.

After a couple of days, Arnold brought H.C. and K.W. to live with A.A. and L.A., and their family. At Arnold's direction, A.A. taught

H.C. and K.W. how to put ads on Craiglist and respond to prostitution clients.

Arnold drove H.C. to prostitution dates. Arnold occasionally rented hotel rooms that were used for the dates. H.C. received calls from dates on a cell phone Arnold had provided. H.C. called Arnold to pick her up from dates using the same phone. H.C. gave all of the prostitution proceeds to Arnold, keeping none. H.C. was dependent on Arnold for food, which he did not always timely provide.

On one occasion, Arnold pushed H.C. against a shower wall with his arm on her throat. Arnold also told H.C. he is a gang member and that he has killed people previously. Arnold told H.C. and others to never speak with police. H.C. was scared and worried that if Arnold was not arrested she "would have to deal with it." A.A. has corroborated the following. Arnold instructed her to teach H.C. and K.W. how to work in prostitution. Arnold took pictures of H.C. at the hotel with his mobile telephone's camera. H.C. worked as a prostitute for Arnold and charged $125 for one-half hour of sex. H.C. gave all of her prostitution proceeds to Arnold and often had to beg him for money to buy food. Arnold brought H.C., A.A., and L.A. to work in prostitution on El Cajon Boulevard twice. Arnold gave A.A.'s old telephone to H.C. in order to allow them to stay in touch if something went wrong during a "date." Arnold has told H.C. that he and others he knows have killed people before and that he is a gang member. A.A. was present when Arnold pushed H.C. into the shower wall and choked her. Arnold was also angered after learning H.C. had sex with an associate. K.W. also confirmed seeing Arnold beat H.C. on this occasion.

//

**4.   K.W.** (Date of Birth: April 29, 1991)

K.W. confirmed to investigating officers that she and H.C. met Arnold and others on September 15, 2007. She told Arnold that she was 16 years-old when they first met. Arnold brought K.W. and H.C. to stay at local hotels where they were pressured to choose a pimp.

After a couple of days in hotels, Arnold brought K.W. and H.C. to live at the home of A.A. and L.A.. Arnold instructed A.A. to teach K.W. and H.C. how to work as a prostitute, including making "dates" over the phone and how much to charge. Arnold told K.W. that if she reported anyone to the police, talked back, or didn't do as instructed, he would personally break her jaw.

**5.   Arnold's Statement**

On October 12, 2007, San Diego Police Department ("SDPD") Vice Detectives and FBI agents arrested Arnold after he was found driving H.C., a suspected juvenile, to complete an act of prostitution. Arnold was accompanied by A.A. Police officers transported Arnold to the police station. There, they advised Arnold of his Miranda rights. Arnold responded, "I'm gonna listen to my mom and I'm gonna get an attorney." Agents stopped questioning. Arnold, however, asked what type of questions the agents would have asked him. When officers told Arnold that they would not ask him questions if he was asking for a lawyer, Arnold insisted on talking.

Arnold claimed he only wanted to be a good friend and help people do whatever they wanted to do. Officers asked Arnold if he knew that H.C. was engaging prostitution at the hotels. Arnold responded that he could not be sure because he was not personally present in the hotel room. When asked how old A.A. was, Arnold stated she was 16 years old.

1  Arnold added, "I am assisting friends do what they want to do."
2 Because the encounters were consensual, Arnold claimed, "even
3 prostitution is okay."  He admitted that A.A. told him that he was
4 driving her to places in order for her to have sex with men in
5 exchange for money.  He also admitted he helped her out financially
6 by holding on to some of their money.

7  Arnold called his mother, Sylvia Arnold, several times from the
8 San Diego County Jail after his arrest.  Recordings of the calls were
9 obtained.  On October 12, 2007, Arnold instructed his mother to talk
10 to "them" because they are the "key to this whole thing."
11 Subsequently, Arnold told his mother to talk to "them" so there won't
12 be so many charges if they say the right stuff.  Arnold told his
13 mother to tell them the only thing he did was drive them.  Arnold
14 further instructed his mother to bring "the girls" to his arraignment.
15 Sylvia Arnold subsequently went to the home of A.A. and L.A. and spoke
16 to their mother.  A.A. and L.A. then accompanied Sylvia Arnold to
17 Arnold's arraignment.

18  On October 16, 2007, Arnold again told his mother that "all they
19 have to do is say they did everything by themselves."  He also
20 mentioned that they have to say that they didn't even give him money
21 for gas.

22  Two cell phones were on Arnold's person at the time of his arrest
23 on October 11, 2007.  One cell phone contained the photographs of L.A.
24 which A.A. which had appeared on Craigslist.
25 //
26 //
27 //
28 //

**B.   Christopher Black**

    **1.   A.A.**

Defendant Christopher Black worked as a pimp with Arnold. On occasion, Black drove A.A. to dates at hotels when Arnold was unavailable. A.A. and Arnold were working at hotels often with Black and L.A. (see below). Black was present on occasions when A.A. received calls for prostitution.

    **2.   L.A.**

L.A. met Black at the same party where A.A. met Arnold in August, 2007. Initially, L.A. told Black that she was 16 years-old, although she was 13 years-old at the time. L.A. began a sexual relationship with Black that first evening and had sex with him on at least two additional occasions.

L.A. agreed to work for Black as a prostitute after she learned that A.A. agreed to work as a prostitute for Arnold. Black took photographs of L.A. and posted an internet ad from a computer. Black instructed L.A. that her picture and phone number would be on the internet and she would receive calls soliciting sex. L.A. informed Black of her true age (14 years-old as of September 1, 2007) approximately two weeks prior to her first posting on Craigslist.

Black instructed L.A. how much money to charge for prostitution. She received an average of $150 for each "date." L.A.'s first date was to the home of an unknown man. Black drove L.A. to her dates. L.A. often called Black when the date arrived and called him to pick her up after performing sex in exchange for money. L.A. gave all of her prostitution proceeds to Black. In total, L.A. had approximately 20 to 25 dates.

//

**C.    Jessica King**

    **1.    A.A. and L.A.**

When A.A. finally agreed to perform acts of prostitution for Arnold, Arnold drove her to El Cajon Boulevard and introduced her to Defendant Jessica King, who worked for Arnold as a prostitute. Arnold instructed King to teach A.A. and L.A. how to solicit johns and otherwise operate as a prostitute. King instructed A.A. and L.A. as instructed, but left working for Arnold in approximately September, 2007.

King used Arnold's mobile telephone to take pictures of A.A. in lingerie and provocative poses. L.A. was present when King posted an ad on the internet and make prostitution arrangements over the telephone. King posted A.A.'s picture on Craigslist for Arnold. King occasionally drove A.A. to the hotels where A.A. performed acts of prostitution.

    **2.    King's Statement**

King was arrested by SDPD on November 8, 2007 for pimping and pandering. She provided the following. King previously worked in prostitution in Las Vegas but returned home to San Diego where Arnold became her pimp. King had known Arnold in high school. King gave the majority of her prostitution proceeds to Arnold.

King admitted that Arnold told her to teach A.A. and L.A. how to work in prostitution. King, however, left Arnold three weeks later because she was very uncomfortable due to the girls' ages. King claims she told Arnold that A.A. and L.A. were too young but Arnold "would not listen." King believes Arnold has changed because he has become angry and mean.

//

## II.

## **SEVERANCE IS NOT NECESSARY OR REQUIRED**

### A.  Joinder is Appropriate Because the Charges Involve Evidence that is Inextricably Intertwined

Federal Rule of Criminal Procedure 8(b) provides for the joinder of defendants where they participated in the same series of acts or transactions constituting an offense or group of offenses. Defendant Arnold moves to sever the counts of the indictment. Rule 8(b) provides for the joinder of defendants where they participated in the same series of acts or transactions constituting an offense or group of offenses. Rule 8 has been construed in favor of initial joinder, whereas Rule 14 is available as a remedy for prejudice that may develop during trial. United States v. Jawara, 474 F.3d 565, 573 (9th Cir. 2007) (quotation omitted). Pursuant to Rule 8(a), at least one of the three conditions must be satisfied for proper joinder. See id. (citation omitted). Rule 8 (a) provides for the joinder of offense, as follows:

> The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged--whether felonies or misdemeanors or both--are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Fed. R. Crim. P. 8(a).

Joinder is appropriate in this case because the evidence for the substantive counts are also charged as overt acts of the charged conspiracies. By definition the conspiracies constitute offenses "based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." See id. Further, all offenses must be proven together as both of the conspiracies involve

Defendant Arnold.  Joinder, therefore, is appropriate.

**B.    Defendants Should Not Be Severed Pursuant to Rule 14**

Defendant Arnold also moves to sever pursuant to Federal Rule of Criminal Procedure 14.  Rule 14 provides:

> If it appears that a defendant or the government is prejudiced by joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

A defendant requesting a separate trial from her co-defendant must demonstrate: (1) prejudice (that is, that a joint trial will compromise a specific trial right or otherwise prevent the jury from making a reliable judgment); and (2) that any prejudice was not cured by appropriate remedial measures at the trial level. Zafiro v. United States, 506 U.S. 534, 539 (1993); United States v. Mayfield, 189 F.3d 895, 906 (9th Cir. 1999).

Defendant Arnold specifically argues that if there is no severance mutually antagonistic defenses will emerge; he will be denied access to exculpatory testimony from Defendant King; he will be denied the right to confront and cross-examine co-defendants; and, the jury will likely find him guilty by association.  Each argument will be addressed in turn.

**1.    Defendant Cannot Establish that Antagonistic Defenses Will Necessarily Emerge**

Defendant Arnold argues that severance is necessary because the defendants may present mutually antagonistic defense claims.  The courts have held, however, that it is difficult to obtain severance on this basis.  United States v. Johnson, 297 F.3d 845 (9th Cir. 2002); see Zafiro, 506 U.S. at 538 (mutually exclusive defenses are

rarely found).  Severance is not necessarily required where there is antagonism between defenses or one defendant desires to exculpate himself by inculpating a co-defendant.  United States v. Throckmorton, 87 F.3d 1069, 1072 (9th Cir. 1996) (citation omitted); see also Zafiro, 506 U.S. at 540 ("[I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials.").

For a claim of antagonistic defenses to prevail, co-defendants must show that their defenses are "irreconcilable and mutually exclusive."  United States v. Anqwin, 271 F.3d 786, 795 (9th Cir. 2001).  Defenses are mutually exclusive if "acquittal of one co-defendant would necessarily call for the conviction of the other."  Id. (citation omitted); United States v. Gillam, 167 F.3d 1273, 1277 (9th Cir. 1999); United States v. Gonzalez, 749 F.2d 1329, 1333-34 (9th Cir. 1984); see also United States v. Cruz, 127 F.3d 791, 799-800 (9th Cir. 1997) (holding that reasonable doubt defense is "not irreconcilable" with innocent bystander defense).  Additionally, for severance to be warranted on the grounds of antagonistic defenses, defendants' respective defenses must be so antagonistic that the jury, in order to believe the defense on one defendant, must necessarily disbelieve the defense of the other defendant.  United States v. Mayfield, 189 F.3d 895, 899 (9th Cir. 1999); see also, Throckmorton, 87 F.3d at 1072 (holding that a defendant must demonstrate the irreconcilable nature between his core defense and his co-defendant's defense to be entitled to severance).

Here, Defendant Arnold cannot show that the defenses are "truly mutually exclusive."  He has identified no statements by co-defendants that are inconsistent with his innocence.  Also, although he points

to instances where his role and that of Defendant Black may be different, he ignores that each may aid and abet the other. Although he notes that defenses may be different, he cannot show that defenses will be necessarily antagonistic, and certainly cannot show that one defendant must be found guilty in order for the other to be acquitted. At the very least, his argument does not overcome the presumption in favor of joinder in this case. See United States v. Escalante, 637 F.2d 1197, 1201 (9th Cir. 1980); Fed. R. Crim. P. 8(b).

### 2. **Defendant Has Not Identified Exculpatory Evidence**

Defendant Arnold also argues that joinder will result in his inability to present exculpatory evidence from Defendant King. He has not presented a necessary affidavit to support his argument. Nor has he provided discovery of any alleged exonerating evidence.

Additionally, where a defendant moves for a severance under Rule 14 because they wish to testify on some counts but not others, the defendant "must show that he has important testimony to give on some counts and a strong need to refrain from testifying on those he wants severed." Whitworth, 856 F.2d at 1277; United States v. DiCesare, 765 F.2d 890, 898 (9th Cir.), modified on other grounds, 777 F.2d 543 (1985) (citing United States v. Nolan, 700 F.2d 479, 483 (9th Cir. 1983)). A defendant is not entitled to severance, however, where they make no such showing in their moving papers and fail to list "the specific testimony he will present about one offense, and his specific reasons for not testifying about others." Id. (citation omitted). The same principle should apply in cases, such as here, where the defendant seeks to present exculpatory evidence of the co-defendant. His argument, therefore, should be denied as unripe. See United

1  States v. Vigil, 561 F.2d 116 (9th Cir. 1977).[1/]

### 3. **Defendant Will Not Be Unduly Prejudiced by Joinder**

Defendant Arnold also argues that prejudice will result from his inability to cross-examine co-defendants regarding statements they made if they elect not to testify. His concern is unjustified.

The admission of a hearsay statement of a non-testifying co-defendant violates a defendant's rights under the Confrontation Clause only when that statement facially, expressly, clearly, or powerfully implicates the defendant. Bruton v. United States, 391 U.S. 123, 135-36. The Ninth Circuit has repeatedly held that the Bruton principle operates only to exclude those statements which are "powerfully incriminatory," "expressly implicate," or "clearly inculpate" the defendant. United States v. Peterson, 140 F. 3d 819, 823 (9th Cir. 1998), United States v. Estrada, 999 F.2d 1355, 1359 (9th Cir. 1993); United States v. Arambula, 987 F.2d 599, 605 (9th Cir. 1993). A statement is not facially incriminating merely because it identifies

---

[1/] On the other hand, the Government may present a co-defendant's statement as a false exculpatory statement not admitted for the truth of the matter asserted. See, e.g. United States v. Hackett, 638 F.2d 1179, 1186 (9th Cir. 1980). Co-defendant statements, which lack the impact of a full-blown confession, do not implicate Bruton and do not require severance. United States v. Olano, 62 F.3d 1180, 1195 (9th Cir. 1995); see also United States v. Tille, 729 F.2d 615, 623 (9th Cir. 1984) (holding a co-defendant's denial of knowledge is not damaging to the defendant under Bruton).

In Hackett, the district court admitted a co-defendant's statements not for their truth, but merely for the fact that the statements were made. Id., 638 F.2d at 1186 (citing United States v. Fried, 576 F.2d 787, 792-93 (9th Cir. 1978)). By combining the co-defendant's statements with other evidence, the statements were shown to be false. Id. The mere fact that the co-defendant made the statements implied his consciousness of guilt. Id. Finally, the Hackett court further clarifies that a defendant's confrontation right against a co-defendant is not implicated where an agent recounts the co-defendant's non-inculpatory statements and is available for cross-examination. Id. at 1186-87. If the Government presents such evidence, Defendant Arnold may cross-examine the testifying witness.

a defendant, however. United States v. Angwin, 271 F.3d 786, 796 (9th Cir. 2001). The statement must also have "a sufficiently devastating or powerful inculpatory impact to be incriminatory on its face." Id. (citations omitted). A co-defendant's statement that does not incriminate the defendant unless linked with other evidence introduced at trial does not violate the defendant's Sixth Amendment rights. Richardson v. Marsh, 481 U.S. 200, 208 (1987); United States v. Hoac, 990 F.2d 1099, 1105 (9th Cir. 1993). Such attenuated evidence is inherently less prejudicial. Richardson, 481 U.S. at 208.

Defendant Arnold has not identified any specific statements by co-defendants in the present case that are facially incriminatory. Unless and until he can make such a showing, his motion should be denied.

On the other hand, the Government may seek to admit statements from Defendant King that she left because she believed the victims were underage. Such an admission does not directly implicate Defendant Arnold unless linked with other evidence, and, therefore, does not violate his Sixth Amendment rights. Richardson, 481 U.S. at 208; Hoac, 990 F.2d at 1105. Defendant King's statements, therefore, should be admitted.

**4. Defendant Cannot Establish Prejudice From a Spillover Effect**

Finally, Defendant Arnold argues that prejudice will result because the jury will presume he was aware of the actions that establish his co-defendant's guilt.

Even if this court presumes prejudice will arise, severance is not required. Instead, this court must use its discretion to tailor the relief to be granted. Zafiro, 506 U.S. at 538-39. Even when "the

risk of prejudice is high . . . less drastic measures [than severance], such as limiting instructions, often will suffice to cure any risk of prejudice." Id. at 539. Juries are presumed to follow proper limiting instructions, absent extraordinary circumstances. Tak Sun Tan v. Runnels, 413 F.3d 1101, 1115 (9th Cir. 2005); see Zafiro, 506 U.S. at 540.

For example, in Zafiro the trial court instructed the jurors that: (1) the Government had the burden of proof beyond a reasonable doubt; (2) they must give separate consideration to each individual defendant; (3) opening and closing arguments are not evidence; and (4) they should draw no adverse inference from a defendant's exercise of the right to silence. The Supreme Court found that these instructions "sufficed to cure any possibility of prejudice" from the four co-defendants' antagonistic defenses. Zafiro, 506 U.S. at 541. This Court has repeatedly found similar instructions sufficient to ameliorate the prejudice of hostile defenses. See, e.g., Gillam, 167 F.3d at 1277 (admonishment that opening statements are not evidence cured attack on co-defendant in opening statement); United States v. Cruz, 127 F.3d 791, 800 (9th Cir. 1997) (court instruction "that the verdict as to one defendant should not control the verdicts of the others" sufficient), overruled on other grounds, United States v. Jimenez Recio, 537 U.S. 270 (2003).

Indeed, the second step of the Zafiro analysis is such a difficult hurdle for defendants to surmount that the Ninth Circuit has only held in one post-Zafiro case that a trial court's limiting instructions (or lack thereof) failed to cure irreconcilable defenses. See Mayfield, 189 F.3d at 906. Defendant Arnold cannot establish that the present case should be treated any differently, or that limiting

instructions would not be sufficient to avoid unnecessary "spillover" of the evidence. For this further reason, therefore, Defendant Arnold's motion should be denied.

## III.

## **THE GOVERNMENT DOES NOT OPPOSE LEAVE TO FILE FURTHER MOTIONS**

Although the Government does not oppose in principle Defendant's request to file further motions, the Government would oppose the filing of any further substantive motions that would not be entertained by the court until the time set aside for motions in limine. If the defendant foresees the need to file further substantive motions, the Government respectfully requests that the defendant request, and the Court set, a separate date for an additional motion hearing, and that any motions in limine and trial not be set until the conclusion of such hearing.

## IV.

## **CONCLUSION**

Based on the foregoing, the Court should deny Defendant's motion for severance.

DATED: July 21, 2008

                                      Respectfully submitted,

                                      KAREN P. HEWITT
                                      United States Attorney

                                      *s/Christopher P. Tenorio*
                                      CHRISTOPHER P. TENORIO
                                      Assistant U.S. Attorney

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **CERTIFICATE OF SERVICE** |
| | ) | |
| Plaintiff, | ) | CASE NO.  08CR0274(1)-LAB |
| | ) | |
| v. | ) | |
| | ) | |
| JORDAN ARNOLD (1), | ) | |
| | ) | |
| Defendant. | ) | |

IT IS HEREBY CERTIFIED that:

I, CHRISTOPHER P. TENORIO, am a citizen of the United States and am at least eighteen years of age.  My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action.  I have caused service of **GOVERNMENT'S RESPONSE AND OPPOSITION TO DEFENDANT'S MOTIONS** on Defendant's attorneys by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 21, 2008                    Respectfully submitted,

*s/Christopher P. Tenorio*
CHRISTOPHER P. TENORIO
Assistant U.S. Attorney

08CR0274-LAB